[No. 39395. Department One. May 9, 1968.]

SCOTT PAPER COMPANY, *Respondent*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Respondent,* CECIL McDOUGLE, *Appellant.**

*Reported in 440 P.2d 818.

William A. Stiles, Jr., for appellant.

Lewis A. Bell (of Bell, Ingram & Smith), for respondent.

WALTERSKIRCHEN, J.†—The phase of this case now before us had its inception January 26, 1959, when claimant, Cecil McDougle, filed with the Department of Labor and Industries an application to reopen his prior 1955 claim. He asserted that his original injury, which had been compensated by an award for 30 per cent permanent partial disability, had been aggravated on November 12, 1958, when he assisted his brother-in-law. The case was before us previously, in 1964, McDougle v. Department of Labor & Indus., 64 Wn.2d 640, 645, 393 P.2d 631 (1964), wherein we said:

> The test to be applied, in cases such as the present, is whether the activity which caused the aggravation is something that the claimant might reasonably be expected to be doing, or whether it is something that one with his disability would not reasonably be expected to be doing.

We also said, at 641:

> Thus we start our consideration of our present problem with an individual who has a 30 per cent permanent partial disability based on a back injury. Such a disability implies the possession of considerable ability to participate in the usual affairs of life. It should be anticipated that he will engage in many varieties of activities—including recreation, taking care of his home, helping his neighbors, and in gainful employment—all commensurate with his existing physical ability.

Thus the prior order awarding 30 per cent permanent partial disability has inherent in it a finding that claimant retains 70 per cent ability, i.e. 70 per cent of his ability to

---

†Judge Walterskirchen is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § .2(a) (amendment 38), state constitution.

perform the work he had performed prior to the award, which was all hard physical labor.

In *White v. Department of Labor & Indus.*, 48 Wn.2d 413, 414, 293 P.2d 764 (1956), we said:

Two significant questions are presented to us: (1) whether the supervisor's closing order of June 16, 1949, indicating the claimant had suffered no permanent disability, is *res judicata* as to the claimant's condition or disability as of that date; . . . .

As to the first question set out above, it is clear that no appeal was taken from the supervisor's order closing the claim on June 16, 1949. We think the department should be bound by this order. In other words, it was *res judicata* as to the extent of the claimant's injury at that time.

In *Kleven v. Department of Labor & Indus.*, 40 Wn.2d 415, 416, 243 P.2d 488 (1952), we said:

The department made an award and closed his claim on January 3, 1944. This order was not appealed from, and, therefore, became *res judicata* as to the extent of his injury at that time.

In *Cirillo v. United Engineers & Constructors, Inc.*, 121 N.J.L. 511, 514, 3 A.2d 596 (1939), the court made this statement, which we approve:

When once the degree of disability from which a workman suffers at a named time has been judicially determined, then in fairness both to the employer and to the employe the question of increase or decrease in disability must be predicated upon the condition as it was at the hearing out of which the determination emanated.

We have defined disability in *Henson v. Department of Labor & Indus.*, 15 Wn.2d 384, 391, 130 P.2d 885 (1942), as follows:

[T]he impairment of the workman's mental or physical efficiency. It embraces any loss of physical or mental functions which detracts from the former efficiency of the individual in the ordinary pursuits of life.

In reversing the trial court in *McDougle, supra,* we directed it to

[S]et aside the order of the Board of Industrial Insurance Appeals, which affirmed the supervisor, and to di-

rect that Board to refer the matter back to the supervisor for further consideration in the light of this opinion. (p. 646)

This was done. The supervisor again denied the claim to reopen for aggravation. Claimant again appealed to the Board of Industrial Insurance Appeals, which overruled the supervisor, and directed the supervisor and the Department of Labor and Industries to reopen the claim pursuant to the Board's decision.

Plaintiff, Scott Paper Company, appealed to the superior court, which reversed the Board of Industrial Insurance Appeals. Claimant again appealed to this court, and we are now considering this case for the second time.

■ We have repeatedly said that the burden is upon the party attacking the findings and decision of the Board to establish the incorrectness thereof by a preponderance of the evidence.[1] *Chalmers v. Department of Labor & Indus.,* 72 Wn.2d 595, 434 P.2d 720 (1967); *Stampas v. Department of Labor & Indus.,* 38 Wn.2d 48, 227 P.2d 739 (1951); *LaLone v. Department of Labor & Indus.,* 3 Wn.2d 191, 100 P.2d 26 (1940).

In *Sayler v. Department of Labor & Indus.,* 69 Wn.2d 893, 896, 421 P.2d 362 (1966), this court said:

[T]he findings and decision of the Board of Industrial Insurance Appeals are prima facie correct; the burden of proof is upon the party attacking them; the appellant must produce *sufficient substantial facts,* as distinguished from a mere scintilla of evidence, to make a case for the trier of fact. (Italics ours.)

In *Allison v. Department of Labor & Indus.,* 66 Wn.2d 263, 268, 401 P.2d 982 (1965), we expressed the rule thus:

In this context, "prima facie" means that there is a presumption on appeal that the findings and decision of the board, based upon the facts presented to it, are correct until the trier of fact finds from a fair preponderance of the evidence that such findings and decision of the

[1]"In all court proceedings under or pursuant to this title the findings and decision of the board shall be prima facie correct and the burden of proof shall be upon the party attacking the same." RCW 51.52.115.

board are incorrect. It must be a preponderance of the credible evidence. If the trier of fact finds the evidence to be equally balanced then the findings of the board must stand.

In the context of what was competent, credible, evidence before the Board in the instant case, we should keep in mind our statement in *Floyd v. Department of Labor & Indus.*, 68 Wn.2d 938, 942, 416 P.2d 355 (1966):

> Nor can we accept claimant's contention that the version testified to by the physician from the history given him by claimant should be used as the description of the accident.

Also, in speaking of the testimony of physicians relative to medical aspects of labor and industries cases, we said, in *Groff v. Department of Labor & Indus.*, 65 Wn.2d 35, 45, 395 P.2d 633 (1964):

> [W]e have, in several cases, emphasized the fact that special consideration should be given to the opinion of the attending physician.

■ While appeals in workmen's compensation cases to this court are no longer tried de novo (see *Benedict v. Department of Labor & Indus.*, 63 Wn.2d 12, 385 P.2d 380 (1963), and *Groff v. Department of Labor & Indus., supra*), it often becomes the duty of the appellate court to evaluate the evidence in a written record in testing conclusions and inferences which have been drawn from the facts—an exploration for sufficiency of the probative evidence to support findings of fact and an analysis of findings when the evidence is undisputed, uncontradicted, and unimpeached. *Benedict v. Department of Labor & Indus., supra* at 14. Such is the situation here.

Looking, then, at the evidence, we note that, in the initial hearing, claimant's counsel asked him: "Did you do any lifting or *any type of physical exertion* on or about November 12, 1958?" (Italics ours.) The record shows no answer to this question, the examiner having interrupted with a question on another subject. Counsel for claimant then resumed his interrogation with the following questions:

Q. Well, did you work for your brother-in-law lifting sacks of oats or something one day around that time? A. Just voluntarily, yes. Q. About how long did you work for him? A. I wouldn't say, it wasn't very long. It was a few minutes. I happened to be visiting and talking with him and him and the hired man was unloading some ground feed, and he was loading it out of the van truck onto one of those cars and he was taking them to the grainary and visiting there with him, *I got a load and helped* and the next day I had to go in for treatments. (Italics ours.)

Later, counsel again asked:

Q. Now, are you sure you didn't experience any sharp pain at the time you were lifting these sacks? A. No.

This constituted the only competent evidence in the initial hearing relative to the incident. It should be noted that the principal thrust of each of the above questions was something other than the manner in which the aggravation was sustained and the unanswered initial question asked about "lifting or *any type of physical exertion.*" (Italics ours.)

At the hearing, after we remanded in *McDougle, supra,* in response to questions making specific inquiry concerning the circumstances surrounding the aggravation incident, claimant testified as follows:

Q. Had you done any type of physical exertion just prior to this — just prior to your going to the doctor? A. Well, not too much exertion. Q. What did you do? A. Well, I helped on a couple of sacks of grain, more or less slid them over. Q. We are trying to find out just exactly what you did, Mr. McDougle, where were you when you helped with these sacks of grain? Where were you? A. I was at Al Albertine's, at Lyman. Q. Now, while you were at Mr. Albertine's farm, would you explain to me exactly what happened to you in relation to these sacks of grain that you were talking about? A. Well, I just went down there to visit, and he was unloading this stand of ground feed; and while talking, I was standing right there beside these sacks, and he had a couple — I guess you'd call it a two-wheel cart — and while I was standing there, he reached over and got a hold of one end, and I got a hold of the other end, and helped slide it over on the other cart. Just a couple of sacks. Q. Was there any trouble lifting these sacks off the ground? A. Oh, no lifting. Q.

By "sliding" these sacks, what do you mean? A. Well, just like — (indicating). . . . It was just — here was the cart, and I was over here, on this end, and he had a hold of this end, and I was barely giving it a shove, and it dropped. You know, down on the — . . . Q. . . . Down on the what? A. This here cart, or whatever you call it. I don't know what you call it, it is a feed cart, I guess.

Further in the testimony, claimant was asked:

Q. . . . Was it necessary for you to lift upward on the sack? A. It wasn't, no. Q. In which direction did you lift or pull the sack? A. Well, I'd say from the right.

Still further in the hearing, claimant was asked:

Q. Do you know approximately how much these sacks weighed? Do you have any way of knowing? A. Ordinarily, I'd say around sixty-five — maybe seventy pounds. That depends, because ordinarily a sack with oats will weigh ninety pounds, and you get about two sacks to ninety pounds of whole oats — . . . Q. Do you know approximately how much these sacks weighed? A. I would — estimating as to the average run, around sixty-five — seventy pounds. That's what I would say. Q. Did you actually lift these sacks from the ground, or from the places where these were slid? A. No.

Later, a question was asked claimant:

Q. And you picked them up with your right hand, because you've got your finger —

Claimant, interrupting, answered:

A. . . . I really didn't pick it up. . . . Q. When you moved the sack along with Albertine, you moved it from the first one, from the top of the sacks, this short distance, and set it down on top of the two sacks that were already on the cart, is that correct? A. Well, I didn't say it was really picked up, it was more or less slid. Q. When you did this, you did pick up the entire weight of the sack on your end at least, did you not? A. I did not, no.

Thus, when direct inquiry was made of the only witness who testified concerning the aggravation incident as to the manner in which the incident occurred, the testimony shows that no direct lifting was done, that the sacks

weighed a maximum of 70 pounds each, and were moved by two people.

Moreover, the attending physician testified that no specific instructions had been given claimant as to what he could lift, and that lifting 50 pounds would not be beyond claimant's "lifting power."

Based on the evidence in this case, there is no more reason to find that claimant lifted the sacks by himself than there is to find that he assisted in sliding the sacks.

Under the evidence of this case, where we are dealing with a man with a 30 per cent disability (established by department order) who had, prior to his initial injury, worked in the woods, operated a small farm where he milked six cows, made hay, and prepared ground for a garden—all very hard work—we conclude that there is just as much reason to say that the conduct of assisting in sliding, or even lifting, two sacks of grain was to be contemplated within the scope of the prior award as to say that it was not. Therefore, not only does the evidence not preponderate against the Board's findings, but the court's findings lack substantial evidence to support them.

When the supervisor said:

> Therefore, the workman knew or should have reasonably known, of the danger in lifting sacks of ground feed and *that such act was an activity he should not have engaged in* and he was, therefore, not acting reasonably, . . . . (Italics ours.)

and later, when the trial court found that:

> [H]is back was in such condition that if he would do the slightest thing he would have an episode of muscle spasms, causing him pain and increased disability . . . that the said *Cecil McDougle knew that he should not work or exert himself* . . . . (Italics ours.)

they were apparently speaking of claimant in terms of his own personal knowledge of his physical condition on the date of the aggravation, a condition which equates more nearly with 100 per cent rather than 30 per cent disability.

It is thus apparent that, in construing the test we set forth in *McDougle, supra* at 645, when we said,

"whether it is something that one with his *disability* would not reasonably be expected to be doing" (italics ours), they have mistakenly assumed we were speaking of claimant's subjective personally known condition as of the date of the aggravation instead of the department-established disability, *i.e.* 30 per cent permanent partial disability.

We, therefore, hold that, when subjected to the proper criteria, claimant's conduct was such as could reasonably be expected of a man with his disability. Therefore, appellant failed to sustain the burden of proof, and the findings of the trial court are not supported by substantial evidence and the judgment, therefore, must be reversed.

The order of the trial court is set aside. The case is remanded and the trial court is directed to remand the case to the Board of Industrial Insurance Appeals for enforcement of its order in so far as it requires the supervisor to reopen the claim and determine the extent of claimant's aggravation and to award him the increase thus determined.

FINLEY, C. J., HAMILTON, HALE, and McGOVERN, JJ., concur.

———

July 22, 1968. Petition for rehearing denied.