IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

PILCHUCK CONTRACTORS, INC., )
                                                        )      No. 71062-1-I
                    Appellant,               )
                                                        )      DIVISION ONE
        v.                                          )
                                                        )
DAVID D. BERKA and DEPARTMENT )
OF LABOR AND INDUSTRIES OF THE )        UNPUBLISHED OPINION
STATE OF WASHINGTON,             )
                                                        )      FILED: July 14, 2014
                    Respondents.         )
_____ )

BECKER, J. — The superior court granted Respondent David Berka's

motion for judgment as a matter of law, affirming the reopening of his workers'

compensation claim for a knee injury he suffered while working for Appellant

Pilchuck Contractors, Inc. We affirm this ruling. On the record presented, a

reasonable jury could only conclude that the work Berka did for Pilchuck was a

cause of the worsening of Berka's knee condition and that the work he did later

for an Arizona employer was not an independent superseding cause.

Berka, 37 years old at the time of the hearing before the Board of

Industrial Insurance Appeals, has always worked for contractors doing

installation and maintenance of underground utilities. On May 2, 2007, Berka

was employed by Pilchuck. While climbing out of a trench, he slipped, fell, and

twisted his left knee. The injury tore the medial meniscus and required two surgeries.

On May 3, 2007, Berka filed a claim with the Department of Labor and Industries. On May 21, 2007, the Department issued an order allowing the claim. Berka had surgeries in 2007 and 2008, but his knee continued to be sore and swollen. His surgeon, Dr. Steven Yamamoto, advised him to find a different position that would meet the restrictions provided by his activity report. The restrictions were no kneeling, squatting, consecutive walking, or consecutive standing.

On October 27, 2008, Dr. Richard Thorson examined Berka's knee and concluded that the injury was at maximum medical improvement; there was no curative treatment at that time that would make him better.

On November 14, 2008, the Department closed the claim with a permanent partial disability award. With the medical restrictions in place, Berka continued to work at Pilchuck as a walking foreman. This position was an accommodation by Pilchuck in the sense that it involved more administrative duties and less physical activity than was required of other foremen. Berka's assignments were limited to level ground, and he was not expected to get into ditches or trenches. Nevertheless, the job still involved considerable time walking jobsites, and occasionally Berka would get into trenches to assist with the actual completion of the work. Although Berka did the job on a daily basis, he continued to complain that walking caused him pain. Berka testified that his knee remained symptomatic and never fully healed. Brad Wauldron, who worked

2

in Pilchuck's safety department and had many discussions with Berka about his knee condition, testified that Berka approached him between November 2008 and January 2009 to ask about being put in a superintendent position, where he would not have daily stress on his knee.

Berka was terminated by Pilchuck on January 27, 2009. According to Jennifer Torvik, human resources manager for Pilchuck, Berka was terminated for poor performance unrelated to his knee injury.

Berka immediately moved to Arizona, where he had a job lined up with Northern Pipeline. Around this time, Berka contacted Wauldron to ask about the process for reopening his industrial injury claim. He also contacted the Department to get a list of physicians and clinics in Arizona who would treat injured workers under a Washington claim.

When Berka arrived in Arizona in early February 2009, Northern Pipeline wanted him to start work immediately. Berka asked to have his start date delayed for a month. He testified that he hoped the knee would improve if he rested it. He told Wauldron he did not want to let Northern Pipeline know he had a knee injury because he was new to the job. Berka began the process of finding a physician in Arizona, and he eventually decided to see physicians at the CORE Institute in Goodyear, Arizona.

On March 2, 2009, Berka began working for Northern Pipeline. He was hired as an equipment operator, not as a foreman, and his job operating a backhoe did not involve walking jobsites. Operating the equipment required climbing up and down and some use of foot pedals.

On April 7, 2009, Berka applied to the Department to reopen the claim for the May 2007 injury due to aggravation of that injury.

On April 15, 2009, Berka had his first medical appointment at the CORE Institute.

On June 4, 2009, Berka had an independent medical examination performed at the Department's request by Dr. James Kopp, an actively practicing orthopedic surgeon. The purpose of the examination was to determine whether the claim should be reopened due to worsening of the left knee condition. Dr. Kopp took a complete medical history and compared his findings with the findings from the closing examination on October 27, 2008. He testified that the knee condition had worsened as demonstrated by objective findings of increased thigh atrophy, that the cause of the worsening was Berka's industrial injury in May 2007, and that Berka was in need of further medical treatment.

On June 22, 2009, the Department reopened the original claim effective April 15, 2009. Pilchuck filed a protest, and the Department agreed to reconsider the reopening order.

On August 14, 2009, the Department issued an order in which it affirmed its decision to reopen the claim.

On August 19, 2009, Berka was evaluated by Dr. Stacey Dale McClure, an orthopedic surgeon at the CORE Institute. Berka's knee pain was continuing to worsen throughout this time, and it caused him to miss about a week of work at Northern Pipeline. Through a physical examination, Dr. McClure found that Berka was limping and was sensitive to touch on his left knee. As a result of this

exam, Dr. McClure scheduled a magnetic resonance imaging test (MRI). The test showed a tear in the posterior horn of the medial meniscus, a very small effusion, and some mild chondromalacia (damage to cartilage under the kneecap).

On September 14, 2009, Pilchuck filed an appeal with the Board of Industrial Insurance Appeals of the Department's decision to reopen the claim.

On January 8, 2010, Dr. McClure performed surgery on Berka's left knee.

On April 7, 2010, Dr. Lance Brigham, Pilchuck's consulting orthopedist, completed a report containing his expert opinion based on a records review. Dr. Brigham is an orthopedic surgeon. His practice consists of seeing patients one day a week and doing insurance medical examinations the rest of the week. He has not performed surgery since 2001.

The hearing of Pilchuck's appeal to the Board took place later in April 2010 before Industrial Appeals Judge Janice Grant. Live testimony was heard from Berka, Wauldron, and Torvik. Perpetuation depositions of the three doctors—Dr. Brigham, Dr. Kopp, Dr. McClure—were taken on April 14, May 10, and May 14 respectively, and the transcripts were made part of the record.

On August 13, 2010, Industrial Appeals Judge David Crossland issued a proposed decision and order affirming the Department's decision to reopen the claim. The decision contained an extensive summary and analysis of the testimony.

On October 5, 2010, the Board granted Pilchuck's petition for review.

On October 19, 2010, the Board issued its final decision. The Board found the proposed decision correct with one minor change not relevant here. The Board decided that between November 14, 2008 (the date the 2007 claim was closed) and August 14, 2009 (the date the Department affirmed its decision to reopen), "Berka's left knee condition, proximately caused by the May 2, 2007 industrial injury, had objectively worsened and was in need of further necessary and proper medical treatment."

Pilchuck filed a petition for judicial review with the superior court. Outlining for the court its position that the claim should not have been reopened, Pilchuck stated, "we believe there's evidence that there was an intervening event or a series of events, exposure, with the new employer, such that a new claim should have been filed in Arizona."

On June 25, 2012, a jury was convened. The testimony before the Board was read into the record for the jury. After both parties had presented all of their evidence, Berka moved under CR 50(a) for a directed verdict or judgment as a matter of law.

On June 27, 2012, the trial court granted Berka's motion:

> THE COURT: Okay. Well, I'm going to do something I very seldom do. I'm going to grant the plaintiff's motion here for a directed verdict. I think reasonable triers of fact could only conclude, based on the evidence in the record, that the prior industrial injury of May 2, '07, was a cause of the problems Mr. Berka had later.
> It is possible that something happened. It's possible that he wasn't candid and didn't report something, but it's always the case that there are possibilities. There's no evidence of that.
> The medical testimony, as I understand it, is that the condition after the surgeries necessitated by the May 2, '07 injury resulted in a weakened, for lack of a better term, leg. He's had, by

6

that time, four meniscectomies, at least. He's most likely going to have continuing problems. The loading and the uneven gait is certainly a major factor in the lateral meniscus problem he later had, and, clearly, to me - - clearly - - the evidence is that all of those are related to the injury of May 2, '07, probably also to the prior injuries. It's a cumulative thing. And nothing that I hear indicated he did much more than just kind of normal stuff after those surgeries. He's working. Maybe he shouldn't work. He's got a family to support.

On July 19, 2012, the superior court signed an order granting Berka's motion for a directed verdict and dismissing Pilchuck's appeal. The court determined that "no legally sufficient evidentiary basis exists for a reasonable jury to conclude" that the Board's decision was incorrect.

Pilchuck timely appealed the superior court's decision.

Pilchuck first contends Berka was procedurally barred from bringing the motion for a directed verdict or judgment as a matter of law because he did not challenge the sufficiency of Pilchuck's evidence at the Board level. The Department is aligned with Berka in opposition to Pilchuck's procedural argument.

Pilchuck alternatively contends that the trial court erred in taking the case away from the jury because the evidence, when considered in the light most favorable to Pilchuck, established a prima facie case that Berka was not entitled to reopen the May 2007 claim and receive further benefits. On this issue, the Department sides with Pilchuck and joins Pilchuck's request that the matter be remanded for trial.

7

## PROCEDURAL ISSUE

CR 50(a) provides as follows:

**(a) Judgment as a Matter of Law.**
(1) *Nature and Effect of Motion.* If, during a trial by jury, a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find or have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against the party on any claim, counterclaim, cross claim, or third party claim that cannot under the controlling law be maintained without a favorable finding on that issue. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment. A motion for judgment as a matter of law which is not granted is not a waiver of trial by jury even though all parties to the action have moved for judgment as a matter of law.
(2) *When Made.* A motion for judgment as a matter of law may be made at any time before submission of the case to the jury.

Motions for directed verdict were renamed motions for judgment as a matter of law effective September 17, 1993. Litho Color, Inc. v. Pac. Emp'rs Ins. Co., 98 Wn. App. 286, 298 n.1, 991 P.2d 638 (1999). A motion under CR 50(a) is to be made before the case is submitted to the jury.

Pilchuck argues that Berka waived his right to bring a CR 50(a) motion at trial because he did not challenge the sufficiency of Pilchuck's evidence at the Board. The simple answer to this argument is that a CR 50(a) motion was not available to Berka at the Board level because there is no jury in Board hearings.

We recognize that Pilchuck's argument is not tied to the literal reference to a jury in CR 50(a). Pilchuck is arguing that a party in an industrial injury case who fails to bring *any* argument challenging the sufficiency of the evidence at the Board level should not be permitted to bring a sufficiency challenge *in court*.

Pilchuck relies on the rule that issues not raised before the Board are generally waived and cannot be raised on appeal to the superior court.

> Upon appeals to the superior court only such issues of law or fact may be raised as were properly included in the notice of appeal to the board, or in the complete record of the proceedings before the board. The hearing in the superior court shall be de novo, but the court shall not receive evidence or testimony other than, or in addition to, that offered before the board or included in the record filed by the board in the superior court.

RCW 51.52.115; Wilbur v. Dep't of Labor & Indus., 38 Wn. App. 553, 559, 686 P.2d 509 (1984), review denied, 103 Wn.2d 1016 (1985).

Rules requiring preservation of error are designed to ensure efficient use of judicial resources. See RAP 2.5; State v. Robinson, 171 Wn.2d 292, 304-05, 253 P.3d 84 (2011). It would be inefficient to permit a party to insist on wasting the superior court's time on a jury trial if there is not enough evidence to support that party's claim. Under RCW 51.52.115, the hearing in superior court is de novo on the evidence in the Board's record. Review of that evidence for sufficiency is a normal and an expected part of the superior court's function in industrial insurance cases just as in every other type of case governed by the civil rules. We conclude Berka was entitled to challenge the sufficiency of the evidence for the first time in the superior court.

## SUFFICIENCY OF THE EVIDENCE

Pilchuck, supported by the Department, argues judgment as a matter of law in favor of reopening the claim was inappropriate because (1) a jury could find the 2007 injury was not a cause of Berka's worsened knee condition or (2)

9

even if the 2007 injury was a cause, a jury could find that Berka's work at Northern Pipeline was a superseding cause of the worsened condition.

This court reviews a motion for judgment as a matter of law de novo, performing the same inquiry as the trial court. Joy v. Dep't of Labor & Indus., 170 Wn. App. 614, 619, 285 P.3d 187 (2012), review denied, 176 Wn.2d 1021 (2013). Judgment as a matter of law is appropriate when, viewing the evidence and all inferences in a light most favorable to the nonmoving party, substantial evidence does not exist to support the nonmoving party's claims. Schmidt v. Coogan, 162 Wn.2d 488, 491, 173 P.3d 273 (2007). Substantial evidence is that which is sufficient to persuade a rational, fair-minded person of the truth of a declared premise. Wenatchee Sportsmen Ass'n v. Chelan County, 141 Wn.2d 169, 176, 4 P.3d 123 (2000).

Generally, a worker may have a claim reopened for aggravation of a condition caused by an industrial injury. RCW 51.32.160. Establishing the right to further medical treatment based on aggravation requires medical testimony that objective symptoms show a causal relationship between the injury and increased disability after the claim closure. Phillips v. Dep't of Labor & Indus., 49 Wn.2d 195, 197, 298 P.2d 1117 (1956). In this case, the required testimony was furnished by Dr. McClure and Dr. Kopp, who both testified that Berka's knee objectively worsened after the claim closing date in November 2008 and that the worsening was causally related to the May 2007 industrial injury.

Pilchuck, supported by the Department, contends Dr. Brigham's testimony would allow a jury to find that Berka's need for further medical treatment of his

10

knee was not caused by the 2007 injury but rather was due to a new injury that Berka sustained, either by a single event or repetitive overuse, after he began to work for Northern Pipeline. Pilchuck and the Department concede there is no direct evidence of any particular injurious event that occurred during the five-week period between Berka's first day of work at Northern Pipeline and his application to reopen his claim. They rely on Dr. Brigham's inference that new objective findings and new pathology documented in Berka's medical records permit an inference that a new injury occurred.

The imaging test requested by Dr. McClure in August 2009 showed a horizontal tear in the posterior body of the medial meniscus as well as mild chondromalacia (damage to cartilage under the kneecap). During surgery in January 2010, Dr. McClure found a horizontal cleavage tear and a radial tear in the mid portion of the lateral meniscus.

Dr. Brigham thought the horizontal tear was a new injury because "something" had to cause this new finding. Dr. Brigham's testimony that "something" must have caused the changes reflected in the records is too speculative to allow a jury to infer that the "something" was a new injury. Dr. Kopp and Dr. McClure both testified that more probably than not the tear in the meniscus was a continuation or progression of the effect of the May 2007 industrial injury, caused by an avoidance pattern in Berka's gait that put abnormal loading on the lateral meniscus. All of the doctors agreed that someone like Berka who has had successive surgeries resulting in progressive

11

removal of more and more of the meniscus is going to continue to have knee trouble.

Dr. Brigham understood from Berka's history as given to Dr. Kopp that Berka was "jumping in and out of ditches" in Arizona. Dr. Brigham described the existence of the finding of chondromalacia in a new portion of Berka's knee as a "new presentation" and "new pathology" that would be caused by "jumping in and out of ditches." The word "jumping" is an exaggeration supplied by Dr. Brigham. There is no evidence in the record that Berka was "jumping."

A reasonable jury could only conclude that the 2007 injury, not some new injury, was the occasion for Berka's renewed need for medical treatment of the knee.

In a variation of the "new injury" argument, the Department contends that a jury could infer from Dr. Brigham's testimony that the worsening of Berka's knee condition was totally unrelated to the May 2007 injury. A worker is not entitled to have a claim reopened if his condition worsened for *entirely* noninjury related reasons. Nagel v. Dep't of Labor & Indus., 189 Wash. 631, 636, 66 P.2d 318 (1937); Jenkins v. Weyerhaeuser Co., 143 Wn. App. 246, 256, 177 P.3d 180, review denied, 165 Wn.2d 1004 (2008).

Dr. Brigham testified that Berka's work as an equipment operator in Arizona caused a worsening of his left knee condition in 2009. But he did not explicitly state that the condition of Berka's knee was totally unrelated to the May 2007 injury. On cross-examination, Dr. Brigham conceded that the May 2007 injury was "a significant cause" of Berka's knee condition. Even when

considering inferences from Dr. Brigham's testimony in the light most favorable to Pilchuck, a jury could not conclude that Berka's knee condition was entirely unrelated to his May 2007 industrial injury. "But for" causation was established beyond dispute.

The primary argument raised by Pilchuck and the Department is that Dr. Brigham's testimony supports an inference that Berka's work at Northern Pipeline was an independent superseding cause of his knee getting worse after he left Pilchuck. This argument revolves around McDougle v. Department of Labor & Industries, 64 Wn.2d 640, 393 P.2d 631 (1964).

In McDougle, a worker sought to reopen a claim for an industrial back injury after his condition worsened. The claimant testified that the day before he sought treatment for an aggravation of his injury, he had been helping his brother-in-law unload some sacks of livestock feed. The Department refused to reopen the claim. The Board affirmed, finding that there was an aggravation that required medical treatment, but it was "'due to a new intervening independent cause, namely, lifting a sack or sacks of grain on that date.'" McDougle, 64 Wn.2d at 643. The superior court affirmed. The worker appealed.

The Supreme Court separated compensable from noncompensable aggravation by asking whether the claimant could reasonably have expected to engage in the activity without injury.

> The supervisor, the Board of Industrial Insurance Appeals, and the trial court were all apparently under the impression that any condition caused by the lifting of the ground feed was not compensable even though, as found by the trial court, it operated upon and aggravated the preexisting disability. In this they were mistaken. Aggravation of the claimant's condition caused by the

13

ordinary incidents of living—by work which he could be expected to do; by sports or activities in which he could be expected to participate—is compensable because it is attributable to the condition caused by the original injury.

McDougle, 64 Wn.2d at 644.

Aggravation is not compensable if it is caused by activities in which the claimant could not, because of his existing disability, reasonably expect to engage without injury. McDougle, 64 Wn.2d at 644. The test to be applied "is whether the activity which caused the aggravation is something that the claimant might reasonably be expected to be doing, or whether it is something that one with his disability would not reasonably be expected to be doing." McDougle, 64 Wn.2d at 645, citing 1 LARSON, WORKMEN'S COMPENSATION LAW § 13.11, at 183. Whether the claimant's lifting of the feed sacks was a reasonable activity for someone in his condition had not yet been considered below. Thus, the court held it was premature to decide that lifting the feed sacks was an intervening superseding cause of the aggravation of the back condition. Accordingly, the court remanded the case back to the Department:

> We cannot, nor can the trial court, the Board, or the Department say that because an individual has a 30 per cent permanent partial disability based on a back injury, that he is thereby precluded from doing any lifting, and that any injury sustained from any lifting is not attributable to his prior injury because it is an intervening cause. Whether it was a reasonable thing for this particular claimant to do, is a different question—never considered by the Department, the Board, or the trial court.
> We are not deciding that the claimant's claim should be reopened. There is testimony from both Dr. King and the claimant which indicates that anything which placed a strain on his back would lead to a temporary exacerbation of his condition; such testimony may have a bearing on whether he acted reasonably. We are deciding that the reasons given for not reopening the claim

do not constitute a sufficient justification for that action, but indicate a disposition of this case on a fundamentally wrong basis.

McDougle, 64 Wn.2d at 645-46.

On remand, the Department again denied reopening, the Board took evidence and overruled the Department, the employer successfully appealed to the superior court, and the claimant successfully appealed to the Supreme Court. Scott Paper Co. v. Dep't of Labor & Indus., 73 Wn.2d 840, 440 P.2d 818 (1968). In deciding the second appeal in favor of the claimant, the Supreme Court noted that the claimant was far from being totally disabled and that no specific instructions had been given to him limiting how much he could lift. The court concluded that the Department and the superior court erroneously considered the claimant's own description of how painful his back was at the time the feed sack incident occurred. They should have been concerned with "the manner in which the aggravation was sustained," Scott Paper Co., 73 Wn.2d at 845, rather than whether the claimant subjectively believed that he should not be exerting himself.

> Under the evidence of this case, where we are dealing with a man with a 30 per cent disability (established by department order) who had, prior to his initial injury, worked in the woods, operated a small farm where he milked six cows, made hay, and prepared ground for a garden—all very hard work—we conclude that there is just as much reason to say that the conduct of assisting in sliding, or even lifting, two sacks of grain was to be contemplated within the scope of the prior award as to say that it was not. Therefore, not only does the evidence not preponderate against the Board's findings, but the court's findings lack substantial evidence to support them.

Scott Paper Co., 73 Wn.2d at 847.

15

Pilchuck and the Department contend that a jury could apply the test established in McDougle and conclude that Berka's work at Northern Pipeline was an intervening cause of the aggravation that necessitated new treatment for his knee. Under McDougle and Scott Paper Co., Pilchuck had to show substantial evidence that: (1) Berka engaged in physical activities that aggravated his condition while he was working for Northern Pipeline and (2) he would not reasonably have been expected to engage in these activities given the extent of his disability at the time his 2007 claim was closed. Because we are reviewing an order granting judgment as a matter of law, we view the evidence in the light most favorable to Pilchuck even though the evidence appears to preponderate in favor of Berka.

Pilchuck and the Department rely primarily on the testimony of Wauldron and Dr. Brigham. The evidence they consider to be significant includes the following:

- Berka told Wauldron in January 2009 that his knee was "'as good as it could be.'" Before leaving for Arizona, Berka talked to Wauldron about reopening the claim against Pilchuck to get a new leg brace, but Wauldron did not recall Berka complaining about new or worsening pain until after he got to Arizona.

- Berka told Wauldron that the work was more physically demanding at Northern Pipeline than it had been at Pilchuck and that "he was getting in and out of holes."

- Berka told Wauldron during one of their phone conversations that he had to take a day off here and there at Northern Pipeline because his knee was bothering him.

- Berka told Wauldron that he did not want to let Northern Pipeline know that he had a knee injury.

16

- Berka began using his knee brace, icing his knee, and taking ibuprofen after starting with Northern Pipeline. Berka told Dr. Kopp that the work he was doing in Arizona was more strenuous.

- Dr. Kopp got Berka's work history wrong when he took it down at the time of examining Berka. Dr. Kopp understood that Berka operated heavy equipment in Washington and was a foreman in Arizona, when in reality it was the other way around.

- Dr. Brigham testified that the discrepancy between how Berka described his work in his deposition and what Dr. Kopp wrote down when taking Berka's work history suggests that Berka was making misrepresentations and gaming the system.

- Dr. Brigham testified that Berka's activities were contraindicated by the restrictions given to him by Dr. Yamamoto.

- Dr. Brigham interpreted Dr. Kopp's notes as reflecting Berka's statement that his work in Arizona involved "jumping in and out of ditches," and he testified that Berka would continue to have injuries if he continued to jump in and out of ditches.

The evidence described above is insufficient to support a finding that Berka's Arizona work was an independent intervening cause of his aggravated knee injury. The inquiry under Scott Paper Co. must focus on the manner in which the aggravation was sustained. Except for Berka's own testimony and his statements to others, there was no evidence of what his work activities actually consisted of in Arizona. Dr. Brigham's depiction of Berka's work as "jumping in and out of ditches" is not supported by the records Dr. Brigham reviewed.

The record supplies no more reason to believe that Berka unreasonably endangered his knee by operating heavy equipment in Arizona than to believe that he unreasonably endangered his knee by the consecutive walking he did as a walking foreman for Pilchuck after his 2008 surgery. It appears that both jobs were physically demanding. Berka was unsuccessful in his effort to find work as

a superintendent or some other indoor position. There is no evidence that Berka was told to avoid work completely if it involved bending or putting weight on his knee. It was reasonably to be expected that after leaving Pilchuck, Berka would continue to work in the area of installation and maintenance of underground utilities.

Pilchuck contends the discrepancy between Berka's work history as reflected in Dr. Kopp's notes and the work history Berka described in his testimony raised an issue of credibility that required resolution by a jury. We disagree. The discrepancy was minor and was not clearly elucidated in the testimony. Dr. Kopp accepted that he just got the history wrong:

> I am presuming that I got the history wrong. And although I did dictate it in front of him, he must have heard it wrong, too, if that's the case. I saw nothing on his exam that would indicate that he was withholding the truth from me at all. So I am presuming that his testimony that you referred to under oath is accurate and that my history is wrong.

Dr. Kopp testified it was immaterial to his opinion whether it was in Arizona or Washington that Berka was a backhoe operator or a walking foreman. In either case, Dr. Kopp testified, the activity would not have caused an injury to Berka's knee if the knee had not already been injured. Dr. Brigham's readiness to conclude that Berka materially misrepresented his work history to Dr. Kopp is not supported by Dr. Kopp's notes and testimony.

In summary, judgment as a matter of law was appropriate. The evidence in the record before the Board is insufficient to prove that the worsening of Berka's knee was completely unrelated to the May 2007 industrial injury or that

18

the work Berka did in Arizona was an independent intervening cause of that worsening.

Berka has requested an award of attorney fees and costs as authorized by RCW 51.52.130. That request is granted.

Affirmed.

Becker, J.

WE CONCUR:

Leach, J.